# 08 CA 11727 NMG

1. NAME AND ADDRESS OF PLAINTIFFS: Samuel Bartley Steele, known as Bart Steele, and Bart Steele Publishing's address is 80 Park Street, Chelsea Massachusetts 02150. Mr. Steele is a singer, songwriter, music publisher and music producer who performs with his bands, The Chelsea City Council and The Bart Steele Band, throughout New England. Steele's music, including the song at issue in this case, can be heard at: www.myspace.com/chelseacitycouncil. Mr. Steele also works as a bartender to assist with paying his expenses and supporting his daughter.
2. NAME AND ADDRESS OF DEFENDANTS: The primary defendants in this case are Turner Broadcasting System, Inc. ("TBS") and Time Warner Corporation. Both TBS and Time Warner do business in all 50 states and all over the world. Time Warner's address is One Time Warner Center, New York, New York 10019. TBS's address is One CNN Center, Atlanta, Georgia 30303.
3. Other defendants include Jon Bongiovi, Richard Sambora, William Falcone, The American Society of Composers, Authors and Publishers ("ASCAP") Fox Television Networks, Major League Baseball / MLB Productions, A&E /AETV, Bon Jovi, AEG Live, Mark Shimmel Music, Vector Management, Island Records / Island Def Jam Records, Aggressive Music / Sony ATV Tunes, Bon Jovi Publishing, Universal Music Publishing Group, Universal Polygram, Pretty Blue Songs, and The Bigger Picture Cinema Co, as well as the owners of every ballpark that the ad at issue was played in, and all of Time Warner's Networks that played the ad in more than 74 countries around the world promoting defendants MLB and Bon Jovi. This list of defendants may grow, since it does not yet include parties responsible for playing the ad on the internet.
4. For addresses of the defendants listed in paragraphs 2 and 3, please see Exhibit A.
5. JURISDICTION: This case involves copyright and trademark infringement, and is therefore subject to the federal question jurisdiction of this federal court under 28 U.S.C. Section 1331 and the Copyright Act, 17 U.S.C Section 101 et seq. and the Lanham Act.
6. ALLEGATIONS: In September of 2004, Plaintiff Bart Steele wrote a love song for his beloved Red Sox and a baseball playoff anthem fans could sing along with. He titled his song "(Man I Really) Love this Team", also known as "Man I Love this Team." The song was originally released in early October 2004, by the Bart Steele Band and Steele's other band, The Gyromatics. Steele, his bandmates, and friends performed the song outside Fenway Park for the next month handing out thousands of cd's and lyrics sheets. Red Sox fans got to know the song very well. There were sing alongs at the two most popular Red Sox bars outside Fenway Park (The Cask n' Flagon and Boston Beer Works both played the song regularly). Bart's roommate, who still works inside Fenway Park to this day, handed out copies to Red Sox executives inside the park. Bart stood outside the executive's entrance to Fenway Park on Brookline Ave. handing copies to anyone wearing a suit. A friend of Bart's had conversations with a member of the Red Sox organization, who asked her to send the song to him. She emailed it to him at jrouke@redsox.com in late October 2004. Bart and bandmate, Peter Bellomo, were

1

invited to play the song live on Channel 7 and Channel 5 and did so on October 26, 2004. An acoustic version of the song was also played on New England's number one Sports radio station, WEEI / 850 AM-Boston, a Fox Sports Radio Network affiliate. The song was also available for free download on many websites, including www.gyromatics.com, www.kohit.com, and, most importantly, www.fenwaynation.com. The fenwaynation site averaged 180,000 "hits" per day in October 2004. The song was also posted at www.mvn.com, (the largest independent sports website in the country), www.phoenix.com, and www.mikehallal.com.

7. Bart sent cds with lyric sheets to Johnny Damon, Bronson Arroyo, team captain Jason Varitek, Kevin "Cowboy Up" Millar, Jerry Remy (Red Sox NESN announcer), Team owner John Henry, & GM Theo Epstein. Bart also emailed the MP3 and links to where the song was available for free download to the general mailboxes of both the Red Sox and MLB.

8. Defendant Jon Bongiovi was in Boston to campaign for John Kerry in late October /early November 2004. He stayed at a hotel a few blocks away from Fenway Park, where Bart and bandmates were performing Bart's song. Thus it is entirely possible that Mr. Bongiovi heard Bart's song, or received a cd copy of it, in 2004.

9. When he sent the song to MLB, he sent them lyric sheets entitled 'I Really Love This Team'. In early November 2004 and throughout the following months, Bart began revising the song and working a marketing concept that would adapt the song for use in any town. Lyrics for this derivative version, entitled "Man I Really Love This Town," are included in on the CD-R attached as Exhibit I (no.5). For example, the words "Yawkey Way" could be replaced by the name of the street outside the ballpark in any town. Bart also shared with MLB his idea that a "country" song would be more marketable for MLB both nationally and internationally. It is important to note that as Bart was working on his derivative version for any team/town he sent defendants derivative lyrics rhyming 'round' with 'town' (and eventually copyrighted these derivative lyrics, as well as the original lyrics, at the Library of Congress in June 2006). He told MLB that he was working on this new version for any team or any town and was replacing the Boston specific lyrics with lyrics for each team and each town.

10. The song was played on the Bobby Bucket radio show in 2005, and in October 2005, Bart played the song on live TV (Chelsea Cable Channel 3) for a hurricane Katrina relief fundraiser. Ironically, this is the performance Bart referenced in his application to become a member of ASCAP. [ASCAP requires prospective members to reference one public performance of a particular original song as part of its application process.] Bart even registered both versions of his song--"Man I Really Love This Team" and "Man I Really Love This Town"-- at ASCAP with himself as both writer and publisher. A copy of the ASCAP title code registration, number 433133272, is attached as Exhibit B. As will be explained below, this registration did nothing to protect Bart's rights.

11. In December 2005, Bart posted the song at his website www.myspace.com/thebartsteeleband
12. Many people began telling Bart that they had his song on their ipods and computers at work and knew of others who had Bart's song as well, but did not know who Bart was. As the number of (uncompensated) downloads grew, Bart realized his song had "made it" and decided to copyright his baseball playoff anthem. He submitted his song to the Library of Congress and received copyright certificate PAu3-052-330, dated June 30 2006. This copyright includes the derivative lyrics Bart told MLB he was working on, which rhyme "round" with "town." To transform Bart's song into an ad, defendants took this rhyme and made it the central focus of the Bon Jovi advertisement's choral refrain, and added in their commercial message: "Let the world keep spinning *round / This is where it all goes down (one of TBS's silly ad messages)/ That's why I love this town.*" For an analysis of some of the other similarities between Bart's song and the Bon Jovi ad, please see Exhibit C, which was prepared by a friend of Bart's who is currently studying for a PhD in Musicology. Moreover, careful review of the visual images in the original ad reveals that they are mostly Red Sox and Boston images—just as in Bart's song. For example, the moment Bart sings "Word is out on *Yawkey Way*, the ad shows a shot of a *Yawkey Way street* sign as Bon Jovi sings "When I'm walkin' down the *street.*"
13. At the same time Bart was finishing his derivative version of his baseball playoff anthem, Bart applied for membership to ASCAP, the American Society of Composers Authors and Publishers. Bart was attempting to protect himself against further uncompensated uses of his work, relying upon ASCAP's reputation as protectors of musician's rights and their many statements regarding their systems for collecting royalties and distributing royalties to their rightful owners. Bart became a member of ASCAP, with the same rights as any other member such as defendant Bon Jovi, in June 2006. As noted above, Bart's application for ASCAP membership included reference to the song at issue, noting that he was both writer and publisher of the song. ASCAP therefore had notice of Bart's song as far back as June 2006, well before Bon Jovi registered his advertisement/song with ASCAP in June 2007.
14. In July 2006, defendants TBS, FOX and MLB announced a seven-year deal in which, for the first time ever, the MLB playoffs would air on cable television rather than free broadcast television networks. Following the 2006 World Series, TBS contacted Bon Jovi through one of its musical consultants, Mark Shimmel. Mr. Shimmel specializes in connecting his corporate clients with the highest level musical talent when they need a jingle or music to use in advertising. (For his profile see the following webpage) http://www.impnow.com/profiles/markshimmel/ Mr. Shimmel's very involvement in this case shows that "I Love This Town" was done as an advertisement for TBS being the new home of the MLB playoffs. When Bart contacted Mr. Shimmel by telephone asking about the matter and how Bon Jovi got his song, Mr. Shimmel told him, "talk to Turner."

3

15. TBS and MLB got their video footage in Edmonton, Alberta (Canada)for the ad that would be released on August 31, 2007 and run through the duration of the 2007 baseball playoffs. On July 31, 2007, baseball's DVD distribution partner, A& E, helped with the recording and production of Bon Jovi's DVD"Lost Highway-the Live Concert." Thus, all defendants were engaged in a mutually-beneficial cross-promotion based entirely upon Barts's song and marketing concept. In fact, Bon Jovi's world tour started the day after the 2007 World Series started—promoted one of the most expensive ad campaigns in history [Time Warner provided $386 million to help promote its networks being the new home of MLB. Furthermore, both MLB and TBS acknowledge that this was the first time MLB worked on an ad campaign with one of its networks. TBS has also acknowledged that it was the first time it aired market-specific content. That is, they produced ads with lyrics specific to each team, just as Bart had proposed. TBS "Creative Director" Craig Barry has also acknowledged in the press that Bon Jovi's role in the ad campaign was to "deliver our [TBS's] message" about TBS being the new home of the playoffs. Bon Jovi's ad soundtrack delivers this message: "No matter where you're from, tonight you're from right here", "You make feel at home somehow", "that's why I love this town", "that's why I keep comin' 'round, etc. This clearly shows that TBS wrote part or all of the unauthorized derivative version of Bart's song, most likely through a method called "temp tracking."
16. Temp tracking involves using one song as a kind of working draft (sometimes called the "reference track") for the creation of (in this case) an audio visual work such as a television advertisement. Simply put, the director takes a song he likes (Bart's song), puts some video images that fit with it, and proposes the rough cut to the client. Sometimes they use that rough cut, and sometimes they decide to hire an established star to perform and / or change the music. It is important to note that the video images in the final MLB/TBS promo track some of Bart's song lyrics too well for coincidence. When Bart first saw the ad, then watched it with his song playing simultaneously, he realized that the striking similarities between the lyrics, music and video images indicated that the Bon Jovi soundtrack was written and recorded to fit with the visual images originally suggested and selected by "cues" from Bart's song. This was a classic case of "temp tracking", as described in the following article:
http://www.ampnow.com/news-infringement.html
17. Baseball's DVD distribution partner, A&E did the artwork for Bon Jovi's "Lost Highway" cd itself. The cd was released in the United States June 19, 2007. Later that year, in November, the DVD was released. This clearly shows how the corporate entities aided Bon Jovi in getting the song/ad and cd itself out, using Bart's work for a huge cross-promotion of their interests, without paying Bart or giving him any credit. In other words, A&E (MLB's distribution partner) was clearly involved before the June 19, 2007 release date of the cd.

18. On October 4, 2007, Bart received the first of many phone calls and email messages from friends "congratulating" him on selling his baseball anthem, and asking him how much he got paid for the TBS/MLB advertisement they were seeing on television. After seeing the ad and hearing its unauthorized derivative version of his song being sung by Bon Jovi, Bart was shocked and devastated, because he had never gotten a response to any of his communication with defendants, nor received any payment for use of his song. Nor had Bart granted synchronization rights or permission to create derivative versions of his song. It is especially offensive to Bart that his song was exploited for commercial purposes, more so than any song in the history of this country.
19. After conferring about this matter with the Volunteer Lawyers for the Arts and the FBI, Bart contacted ASCAP. After hearing his story, ASCAP employees Greg Potter and Robert Cheatham encouraged Bart to send them all of his musicology and "temp track" evidence and suggested he formally request that ASCAP freeze payment of royalties on the Bon Jovi ad soundtrack. Bart sent a letter dated January 23, 2008 requesting ASCAP look into conflicts and freeze royalties. In February, Bart sent ASCAP a video of the ad with his own song substituted for the Bon Jovi soundtrack, to show how well the visual images track Bart's song lyrics. ASCAP repeatedly assured Bart that they would make a decision on his claim within 4 weeks.
20. After several inquiries into the status of his claim, Bart received a conference phone call from ASCAP on April 21, 2008. In that phone conversation, ASCAP employees Robert Cheatham and Andrew Rodriguez told Bart and his girlfriend Carly, who was listening on speakerphone, that they found it "very hard to believe that this (the Bon Jovi song) was independent creation on their (defendants') part with the whole baseball thing and video." When Bart thanked them, and told them he was so depressed over this that he was at the point of jumping off a bridge, they told him would be "more depressed to know how much this type of thing happens [in the music/ advertising business], because that's what we deal with here in the repertory department." When Bart asked if ASCAP was going to freeze the royalties, Cheatham and Rodriguez replied that they were going to send out a "discrepancy letter that same day". Bart then asked if that meant he should proceed with sending defendants the cease and desist letter he had drafted. Cheatham and Rodriguez specifically told Bart not to send a cease and desist letter because that would "scare away" the defendants. They told Bart that ASCAP wanted to "get the parties together" to resolve the matter, and that sending a cease and desist letter to protect his rights would interfere with any attempts to resolve the matter informally. ASCAP employees Cheatham and Rodriguez told Bart that he had "handled this matter perfectly up to this date". Bart thanked them and told him that he looked forward to receiving the letter confirming the conversation, which ASCAP told him to expect via email later the same day.
21. Four days later, Bart received another phone call from ASCAP. In that conversation, ASCAP employee, Robert Cheatham asked Bart to put in writing the publishing/writing

5

percentages he was claiming for his song and to email it to them immediately. The next day Bart received the discrepancy email/letter that was sent to all parties. The discrepancy email/letter is attached as <u>Exhibit D</u>. The letter/email was also sent to the three artists that claimed to write the song (Jon Bongiovi, Richard Sambora, and William Falcone). It was also sent to their respective publishing companies.

22. A few days later, Bart received a promising email from Universal Publishing indicating that they had received the discrepancy letter/email and would be "working to resolve this matter with you" and would be "working on Mr. Bongiovi's behalf". ASCAP also subsequently announced that the guest speakers at the ASCAP Expo in Los Angeles would be John Bongiovi and Richie Sambora. ASCAP knew that Bart had been planning to attend this event since October 2007. On April 9, 2008, everything was looking positive when Bart flew out to L.A. for the expo, hoping he and Bon Jovi could shake hands and laugh about how they were both used by corporate America. Bart even learned all their new songs from 'Lost Highway' on mandolin and guitar in case he could join them on tour when this all worked out. The day after the discrepancy letter was sent out, Bon Jovi cancelled their 2 August concerts at Fenway Park, and Richie Sambora was arrested for drunk driving and facing jail time. Given the enormity of the problem facing all parties and the human toll it was already taking upon Bart, Sambora and others, Bart was willing to attempt to resolve the matter informally. Shaking hands and agreeing to work out a deal where Bon Jovi gave Bart some kind of credit or career help seemed the only reasonable way to proceed—no one, even the large corporate defendants and a band as big as Bon Jovi could calculate the infringement damages involved. Bart had realized that TBS' conduct was willful infringement: they said or did something to give Bon Jovi the idea that they had the rights to use Bart's song. Why would Bon Jovi, arguably the biggest rock band in the world, steal a song from an unknown artist like Bart? Answer: They wouldn't. They would, instead, insist upon assurances that any song presented to them had been "cleared" and was ok to use. But no one at TBS ever cleared the rights to Bart's song. And thus began the snowballing screwup that brings us to court today.

23. Things changed when Bart arrived in Los Angeles for the ASCAP "I Create Music" Expo on April 10, 2008. After registering at the Expo, Bart spoke with ASCAP employee John Baird. Baird told Bart that Bon Jovi's publicist had warned ASCAP to "keep Bart away" from Bon Jovi. Over the lunch break, Bart received an email messages from attorneys for John Bongiovi and Richard Sambora (obviously sent to arrive while Bart was travelling). The messages threatened Bart not to pursue this any further, in stark contrast to ASCAP's stated desire to bring the parties together and help resolve the matter. Frustrated and upset that the lawyers were obstructing resolution, Bart decided not to attend even the staged interview with Bongiovi and Sambora scheduled for that afternoon. Instead, Bart toured the Expo's exhibits, where he again ran into ASCAP employee John Baird. Baird told Bart that he had received an email message ASCAP circulated among its employees involved with the Expo, which stated that ASCAP

expected Bart to attend the Expo and that he might cause trouble for the Bon Jovi interview. Mr. Baird then asked Bart to wait a moment while he went and spoke to someone. When he returned, Baird told Bart that he had just spoken to "Bon Jovi's people" and that he told them Bart "was cool and was not going to cause trouble, he's not even going to the interview." In response to Bart's question as to why ASCAP did not freeze the royalties, Baird stated, "Bon Jovi is our biggest fish." Baird also told Bart that he had heard about his case and it was clear to him that the party Bart "should be going after was Turner." Baird then suggested that Bart take a few minutes to write a note to Bon Jovi, which he would pass to "Bon Jovi's people" for Bart while they were all at the Expo. Bart then wrote the note attached as Exhibit E.

24. At the Expo later that day, Bart spoke to a representative of ASCAP's legal department, Ellen Meltzer-Zahn. Ms. Zahn told Bart that it was very strange that ASCAP had not frozen royalties in his case, as it was their standard procedure to freeze royalties when they sent out a letter like the one Bart had received. She refused to assist in connecting Bart with Mr. Bongiovi. However, she did pass on the handwritten note (Exhibit E) Bart had written seeking to end the matter with a handshake immediately.

25. Having made no progress on resolving the matter at the ASCAP Expo, Bart returned to Boston. He then complied with ASCAP's (rather strange) request in the March 25, 2008 ASCAP discrepancy letter that he submit documentation substantiating his claim. This request was strange in light of the fact that Bart had been submitting documentation to ASCAP for several months, and ASCAP had acknowledged receipt of that documentation and told Bart several times that they had everything they needed regarding his claim. Nevertheless, on April 20, 2008, Bart sent ASCAP a letter resubmitting all the documentation he had sent ASCAP over the previous months. A copy of that letter is attached as Exhibit F. ASCAP also told Bart that any correspondence he sent regarding this matter should be cc'd to ASCAP. To date, Bart has received no reply to the final April 20 submission, nor any other communication from ASCAP. It is also interesting to note that the March 25 discrepancy letter sent by ASCAP asked *all* parties—including Jon Bongiovi and Richard Sambora—to submit documentation of their claims to have written the song. No one has ever sent Bart copies of any information submitted by anyone else claiming rights in the song, or even let him know whether ASCAP received such information. Bart has also called ASCAP several times since submitting the April 20 letter, with no response.

26. Tired of being given the run around by everyone (including the agency claiming to support his interests, ASCAP), Bart went public with his story in both print and television media. Boston Magazine published the article, "*Ballad of a Mad Fan*," in its June 2008 edition. Channel 5 aired a companion piece in late June. Both these entities could clearly hear that the Bon Jovi ad was a generic version of Bart's baseball anthem. A copy of the magazine is attached as Exhibit G. (See page 80.)

27. On September 29, 2008, Bart sent a cease and desist letter to defendant TBS, demanding a response within 48 hours. A copy of that letter is attached as <u>Exhibit</u> <u>H</u>. No response has been received as of the date of this complaint.
28. Copyright Infringement: Bart contends that defendants have violated the rights protected by the copyright laws, particularly the right to make derivative works and control commercial exploitation of his work. Without court intervention and action, a dangerous precedent will have been set here: Bart's baseball playoff anthem was changed into an ad for MLB/TBS, and the record-buying public is unknowingly purchasing an ad for MLB/TBS with every "Lost Highway" album. The corporate entities helped get this ad out on Bon Jovi's album. The more popular the song becomes, the more effective the ad. The best advertisement is the one that no one knows is an advertisement at all.
29. "Temp Tracking:" In making the ad which so closely tracks Bart's lyrics, defendants synchronized video images to Bart's song without his permission. Bart can show that with music production computer tools available, defendants could easily change Bart's song into the Bon Jovi ad by simply copying and dragging or cutting and pasting parts of the music just as we do with word processing programs. This violation of Bart's "synch rights" is technically copyright infringement but of course almost impossible to prove, since once the temp track has been used and changed enough, the original temp track is discarded. This practice is rampant in both music production and the advertising business. The court should acknowledge and stop this practice. To easily hear the temp track evidence, please review <u>Exhibit</u> <u>I</u>, a CD-R containing both Bart's original song in MP3 format and the MLB/TBS Bon Jovi video with Bart's song substituted in as soundtrack. The ad with its Bon Jovi soundtrack can currently be seen and heard on the internet as well as on television. since TBS is using it again to promote its broadcast of the 2008 baseball playoff games. Google: 'Bon Jovi MLB promo ad' to see the youtube of the original advertisement. ( Or, for your convenience, Bart has included the youtube link to the original MLB/TBS promo advertisement on the CD-R Ex. I- #5) Be careful not to confuse it with the brand new MLB/TBS/Bon Jovi commercial in which they got the new video footage from the MLB sponsored Bon Jovi free concert in Central Park. Bon Jovi was promoting the kick off of the all-star game weekend in New York for MLB. MLB, which put up the money for the show, and TBS got their new video footage.

30. Palming Off / Lanham Act violation: Defendants changed Bart's song into an ad without permission, and gave the song to a bigger, more marketable star to further their own ends,giving Bon Jovi (tacit or explicit) permission to claim they wrote it without giving credit to the true "ghostwriters—Bart Steele and TBS. These actions constitute palming off Bart's work as the work of another—Bon Jovi—in violation of the Lanham Act. Many people (including, notably, a friend of one of the owners of the Boston Red Sox) have told Bart that they heard the Bon Jovi ad and thought it was Bart's song, which they remembered hearing as far back as 2004.

31. RELIEF REQUESTED: Bart is requesting damages as authorized by the copyright law. As intent will be easy to prove, we are seeking the statutorily authorized amount of $100,000 per cd sold. Just under 4 million cds have been sold to date. This totals almost $400 billion. This total does not include even digital sales royalties, or a portion of concert profits. Bon Jovi's "Lost Highway" tour was the highest-grossing tour on the planet this year. The tour was supported and promoted by AEG Live and Bon Jovi's 'I Love this Town Contest." (In exchange for the chance to win concert tickets, fans sent in videos to be played while Bon Jovi performed the ad song during the concert in their town.) Nor does this total include any portion of past royalties paid on the song. Using the copyright law's measure of damages points out how the law has failed to keep up with current developments in the music business. It is almost impossible to calculate the number of performances of the unauthorized work, and any attempt to figure damages based on the identifiable performances—in ballparks, on television, and in movie theaters in this country and around the world-leads to an incomprehensibly large number. A "quantum meruit" measure of damages for the value of what defendants got from Bart is also hard to calculate given the enormity of the publication involved. The ad defendants put together from Bart's song and marketing concept became, by any measure, the most expensive and successful ad in sports history.

32. Because it has been so difficult to calculate the extent of the violations of his rights and to prove and enforce those rights, Bart intends to give 99% of this recovery to musicians' rights organizations, including ASCAP and the Copyright Office itself, to help protect the rights of songwriters and publishers, and to bring public awareness to the injustice of "temp tracking"—a method of stealing songs that current law does not adequately protect. As Bart's saga shows, the current state of the law allows ASCAP and the Copyright Office to turn a blind eye to the very wrongs they are supposed to guard against: copying, changing and using songs without the permission of the author."Temp tracking" has become standard industry practice, but it is still copyright infringement. The reason this lawsuit is so large and that temp tracking has become such a common practice is that the Copyright laws have not caught up to the digital age. Who decides when a temp track has been changed just enough that the new song can avoid liability under the copyright law? If it came from the temp track, it is a derivative work—even if the original author was not there to hear it or authorize its use or grant synch rights. Because it is now too easy to copy and change songs with the click of a computer mouse, corporations routinely exploit the work of independent artists without compensating them, discouraging creation and advancement of the arts, and frustrating the purpose of copyright laws. Under current law, the superior resources of organizations like defendants MLB, TBS and large publishers enable them to absorb all the smaller players, achieving monopoly control over whatever art they wish to exploit. An article written in August 2004 by Ted Turner, the founder of defendant TBS, sums up the issue nicely.

Mr. Turner states, "In the media...big corporations play a vital role, but so do small, emerging ones...They are independent thinkers. They know they can't compete by imitating the big guys—they have to innovate, so they're less obsessed with earnings than they are with ideas. ...When the independent businesses are gone, where will the new ideas come from? ...This is a fight about freedom...the freedom of citizens to get news, information and entertainment from a wide variety of sources, at least some of which are truly independent and not run by people facing the pressure of quarterly earnings reports." Bart clearly realizes that he is the independent thinker, who wrote a love song to his favorite baseball team and home town. He wanted to get the crowd to get up off their seats, singing along together, for the love of their team and town. What happened instead was that everyone except Bart got paid. Unless independent thinkers are protected in the courts, as Ted Turner says, nothing less than freedom is lost.
33. Bart thanks the Court and staff for their time and attention.